OPINION
HUG, Circuit Judge:
Earth Island Institute (“Earth Island”) appeals interlocutorily the district court’s order denying its motion for a preliminary injunction seeking to enjoin the United States Forest Service (“Forest Service”) from conducting post-wildfire logging in the Plumas National Forest. The district court concluded that the applicable forest plan required only the assessment of habitat for the black-backed woodpecker (“woodpecker”) at the project level, that the Forest Service met that requirement, that the Forest Service adequately responded to Earth Island’s dissenting scientific opinions in the project adoption phases, and that the Forest Service’s tree mortality guidelines were not legally enforceable. We affirm.
I. FACTUAL BACKGROUND
In the summer of 2007, the “Moonlight” and “Wheeler” fires burned a total of 88,-000 acres of private and National Forest land in the northern Sierra Nevadas in California. Approximately 78% of the fire took place within the Plumas National Forest. The rest was on private land.
Shortly after the fires, the Forest Service initiated the Moonlight-Wheeler Project (“project”) to remove burned trees posing a safety hazard to road traffic within the project area (“roadside hazard trees”), to recover the value of fire-killed trees, and to reestablish the forest through the planting of conifer seedlings.
It is undisputed that forests burned at high intensity form a new type of ecologically rich ecosystem. This case concerns a subset of such an ecosystem, namely so-called “snag forest habitat.” Snag forest habitat is important to several species of plants and animals. One of the species that depends on snag forest habitat is the black-backed woodpecker; a management indicator species (“MIS”)[1] for the Sierra Nevada area. The woodpecker can only use snag forest habitat for up to a decade after a high-intensity fire at which point in time the forest will have changed naturally and the woodpecker must seek out new suitable habitat. According to a Plumas National Forest district ranger, snag forest habitat is extremely scarce in the Sierra Nevadas due to fire suppression and post-fire logging.
Some dispute exists as to exactly how much of the woodpecker habitat in the Plumas National Forest would be destroyed by the project. Earth Island’s experts conservatively estimate that at least 40-60% of the woodpecker’s habitat within the project area would be destroyed, corresponding to 30-50% of woodpecker habitat throughout the entire Sierra Nevada. According to Earth Island, this could threaten the woodpecker’s ability to survive in the Sierra Nevadas. In contrast, the Forest Service asserts that logging would only be conducted on approximately 22-27% of the forest burned on public land, thus leaving as much as 73% unlogged. However, the Forest Service also acknowledges that approximately 38% of the habitat that was created by the two fires on public land would be destroyed, but points out that to compensate *468 for this, snag habitat has been designated on approximately 10% of the project area with no logging to take place there.
II. PROCEDURAL BACKGROUND
Initially, the Forest Service proposed a separate project that would result in the logging of roadside hazard trees only. After Earth Island brought a challenge to that, the parties settled. The settlement provided that the Forest Service would reevaluate that project as part of an Environmental Impact Statement (“EIS”) then underway for non-hazard tree logging.
The Forest Service subsequently issued a Draft Revised EIS covering both roadside hazard and other trees. Earth Island submitted extensive timely comments on the draft. The Forest Service subsequently issued a Revised Final EIS (“RFEIS”) analyzing five alternatives. Half a year later, the Chief of the Forest Service issued an Emergency Situation Determination allowing the Forest Service to implement the project as soon as a Record of Decision (“ROD”) was signed. The Chief found this to be warranted given the threats to public and employee safety and the fact that any delay in the implementation of the project would result in substantial loss of economic value and jeopardize other restoration and recovery objectives.
Soon thereafter, the Forest Service signed the ROD for the project, choosing alternative A. This authorized the harvest of fire-killed trees on approximately 14,755 acres of the approximately 41,000 acres of high severity burn areas using both ground- and air-based harvesting methods. The Forest Service subsequently awarded five logging contracts to local companies.
Subsequently, Earth Island filed a motion for a preliminary injunction seeking to enjoin the Forest Service from implementing all aspects of the project, including the felling, removal and sale of any trees apart from under emergency hazard circumstances. The district court denied Earth Island’s motion. This appeal followed.
III. STANDARD OF REVIEW AND JURISDICTION
We have jurisdiction to review a district court’s denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). We review the denial of a preliminary injunction for abuse of discretion. Earth Island Inst. v. U.S. Forest Serv. (Earth Island Inst. II), 442 F.3d 1147, 1156 (9th Cir. 2006). A district court abuses its discretion in denying a request for a preliminary injunction if it bases its decision on an erroneous legal standard or clearly erroneous findings of fact. Lands Council v. McNair, 537 F.3d 981, 986 (9th Cir.2008) (en banc). A district court’s decision regarding preliminary injunctive relief is subject to “limited and deferential” review. Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir.2003) (en banc) (per curiam). Accordingly, “[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.” Earth Island II, 442 F.3d at 1156.
In deciding whether Earth Island is likely to succeed on the merits of its motion for a preliminary injunction, the APA sets forth additional requirements for review. McNair, 537 F.3d at 987. The APA states, in relevant part, that a reviewing court may set aside only agency actions that are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” Id., citing 5 U.S.C. § 706(2)(A). Review under this standard is also narrow, and we may not substitute our judgment for that of the agency. Id. Rather, a decision may only be reversed as *469 arbitrary and capricious “if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Id. Thus, although the district court’s denial of Earth Island’s request for a preliminary injunction must be reviewed for an abuse of discretion, our review of the district court’s determination as to whether Earth Island was likely to prevail on the merits of its claims necessarily incorporates the APA’s arbitrary and capricious standard. Id.
IV. DISCUSSION
A party seeking a preliminary injunction must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). “An injunction is a matter of equitable discretion” and is “an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.” Id. at 376, 381.
Earth Island argues that the district court improperly assessed Earth Island’s likelihood of success on the merits, applied an erroneous standard for the likelihood of irreparable harm, and incorrectly balanced the equities.

A. Likelihood of Success on the Merits

First, Earth Island contends that the district court imposed an unreasonably high standard for success on the merits. In doing so, Earth Island relies on the district court’s statement that after Winter, “a heavy burden is imposed on plaintiffs.” Earth Island argues that this means that the district court required more indicia of success on the merits than did Winter.
The district court’s statement forms part of a footnote and appears to simply be dictum. At any rate, as Winter plainly demonstrates, it is correct that plaintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this “extraordinary remedy.” 129 S.Ct. at 376. Characterizing this as a “heavy burden” was not improper and does not show that the district court applied an erroneous standard. Quite the contrary: the record shows that the district court correctly applied Winter’s four-prong analysis throughout its thoroughly reasoned opinion.
Next, Earth Island contends that it is likely to succeed on the merits of its claims because (1) the Forest Service failed to ensure the viability of the woodpecker and thus violated the National Forest Management Act (“NFMA”); (2) the Forest Service’s RFEIS failed to respond sufficiently to comments made by Earth Island’s scientists; and (3) the Forest Service failed to follow its allegedly binding tree marking guidelines.

i. Purported species viability requirements

As we stated in Ecology Center v. Castaneda,
The National Forest Management Act ... provides both procedural and substantive requirements. Procedurally, it requires the Forest Service to develop and maintain forest resource management plans. After a forest plan is developed, all subsequent agency action ... must comply with NFMA and the governing forest plan. Substantively, *470 NFMA requires that forest plans “provide for diversity of plant and animal communities based on the suitability and capability of the specific land area.”
574 F.3d 652, 656 (9th Cir.2009) (citations omitted). However, we also explained that the Forest Service’s “1982 rule” which required the Forest Service manage fish and wildlife habitat “to maintain viable populations of existing native and desired nonnative vertebrate species” was partially superceded in 2000 (the “2000 Rule”). Id. at 657. As we stated, “[t]he requirements of the superceded 1982 Rule apply only to the extent they were incorporated into the Forest Plan.” Id. at 657. (emphasis added).
Similarly, in McNair, we stated that “[t]he NFMA unquestionably requires the Forest Service to provide for diversity of plant and animal communities ... in order to meet overall multiple-use objectives.” 537 F.3d at 992 (quotation marks omitted). But emphasizing the “inherent flexibility of the NFMA”, we pointed out that the NFMA does not “specify precisely how” the Forest Service must demonstrate that it has met the objectives of the pertinent forest plan. Id. As we said,
as non-scientists, we decline to impose bright-line rules on the Forest Service regarding particular means that it must take in every case to show us that it has met the NFMA’s requirements. Rather, we hold that the Forest Service must support its conclusions that a project meets the requirements of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable. The Forest Service must explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable. We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan.
Id. at 993-94 (emphasis added). In contrast to the case at hand, the Forest Plan at issue in McNair contained specific provisions regarding wildlife viability. Id. at 989 (“The ... Forest Plan requires the Forest Service to manage the habitat of species listed in the Regional Sensitive Species List to prevent further declines in populations which could lead to federal listing under the Endangered Species Act.”) (alteration and quotation marks omitted). Even so, “neither the NFMA nor the ... Forest Plan require the Forest Service to improve a species’ habitat to prove that it is maintaining wildlife viability.” Id. at 995. Further,
Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands. Indeed, ... it has never been the case that the national forests were to be set aside for non-use ... Congress’ current vision of national forest uses ... states that it is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes.
Id. at 990 (emphasis added, alteration, citations and quotation marks omitted).
Here, the Plumas National Forest Plan was amended in 2004 and 2007. Earth Island cites to language in the 2004 amendment indicating that the forest management approach chosen “will provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species in the planning area, and maintain the diversity of plants and animals.” *471 Earth Island contends that this shows that the Forest Service was to ensure the viability of the woodpecker. This statement does not clearly stand for this proposition. First, it could be read to mean that the Service was to ensure the distribution of the species, especially when read in combination with the most recent amendment which also calls for distribution, but not viability analyses. Second, the requirement pertains to the planning area, not the project area at issue in this case. As shown below, the Forest Service did, in fact, find that there would be no change in the distribution of the woodpeckers at the Sierra Nevada level. Similarly, the 2007 amendment only requires “[distribution population monitoring [to] track changes in the distribution of each MIS at the Sierra Nevada scale by monitoring the changes in the presence of the species across a number of sample locations,” but “[t]he sole MIS requirement that is applied at the project-level is the assessment of habitat for MIS. Further, there are no monitoring requirements for MIS at the project level.” (Emphasis added).
The record shows that the Forest Service satisfied the requirement to assess MIS habitat in the project area. For example, in the Management Indicator Species Report for the Moonlighh-Wheeler project, the Forest Service acknowledged the importance of snag forest to the woodpecker, estimated post-fire snag forest density in the proposed project area, analyzed the direct, indirect and cumulative effects of logging on the habitat under the five proposed alternatives. The Forest Service concluded that “[a]ll action alternatives, combined with ongoing and planned fire-killed tree removal projects, leave more area unharvested than harvested within the analysis area.... Leaving the majority of the burn in an unharvested condition maintains an important component of biological diversity [for] all the unique plants and animals that depend on those first few years of natural (postfire) succession. This includes the [woodpecker].” The RFEIS similarly analyzed the effects of the proposed project on the woodpecker’s habitat needs at the project level in a thorough manner. As the district court noted,
the [Forest Service] analyzed the amount of suitable habitat that would be lost in the analysis area due to salvage logging, and concluded that 62% of suitable habitat created by the Moonlight and Wheeler fires, or 20,172 acres, would remain untreated, and thus still support an upward trend in BBWO [black-backed woodpecker] population. Finally, the [Forest Service] also analyzed the relationship of the project-level habitat impacts to the bioregional BBWO population trends and determined that after Project implementation, there would still be sufficient acres of forested areas that burned at high severity to support BBWO suitable habitat.
Further, the district court correctly found that the species distribution requirements only applied to the greater Sierra Nevada bioregional level, but not to the specific project at issue here. The district court correctly found that the Forest Service had analyzed the population distribution data in sufficient detail, concluding that the project would preserve a sufficient area to support the woodpeckers.
We give great deference to agencies when faced with this type of scientific evidence. See, e.g., Castaneda, 574 F.3d at 664; McNair, 537 F.3d at 993. Although we relied on species viability requirements in, for example, McNair, 537 F.3d at 992, 998, we emphasize the fact that such requirements only apply when contained in the pertinent forest plan for the site-spe *472 cific area. Id. at 992, 994-95. This was not the case here. Earth Island also relies on the 1983 version of 36 C.F.R. § 219.19 as standing for the proposition that species viability was required. But as we said in McNair, “[s]ection 219.19 required the Forest Service to manage wildlife habitat ‘to maintain viable populations of existing ... species’ and required the Forest Service to designate management indicator species (MIS) to monitor and evaluate wildlife viability. This regulation is no longer in effect.” 537 F.3d at 989 n. 5 (emphasis added, citation omitted). Here, in explaining how the 2007 Plumas National Forest Plan Amendment relates to the partially superceded 1982 planning rule, the Forest Service emphasized that “only the aspects of § 219.19 in the 1982 planning rule related to selecting MIS (§ 219.19(a)(1))[2] and monitoring during forest plan implementation (§ 219.19(a)(6))[3] apply. Other aspects of § 219.19 are related to forest plan development or revision and do not apply.” (Emphasis added). Accordingly, Earth Island’s reliance on 36 C.F.R. § 219.19 is unavailing.
Our role is “simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious.” McNair, 537 F.3d at 993 (quotation marks omitted). This was not the case here. Courts may not impose “procedural requirements not explicitly enumerated in the pertinent statutes.” Id. (alteration omitted). Accordingly, the district court did not abuse its discretion when it concluded that Earth Island was not likely to succeed on the merits of its argument that in analyzing and implementing the project at issue, the Forest Service was required to ensure species viability.

ii. Forest Service Responses to Earth Island’s Comments

Earth Island contends that the district court abused its discretion in finding that the Forest Service adequately responded to the dissenting scientific comments submitted by Earth Island’s scientists during the RFEIS comment period. In particular, Earth Island alleges that the Forest Service responded in an impermissibly generalized manner and that the RFEIS did not address certain specific comments by Earth Island’s experts, Mr. Rhodes and Dr. Royce.
Under NEPA, agencies must ensure the scientific integrity of the discussions and analyses in their environmental impact statements. 40 C.F.R. § 1502.24. In doing so, they must “discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency’s response to the issues raised.” 40 C.F.R. § 1502.9(b). However, agencies have broad discretion in choosing how to respond to opposing scientific evidence. 40 C.F.R. § 1503.4. Nonetheless, the EIS “must respond explicitly and directly to conflicting views in order to satisfy NEPA’s procedural requirements.” Earth Island II, 442 F.3d at 1172. That being said, “an agency need not respond to every *473 single scientific study or comment.” Castaneda, 574 F.3d at 668.
First, the district court cited to numerous instances in the RFEIS where the Forest Service responded in detail to the specific comments raised by Earth Island. For example, the court found that the Service commented on the adequacy of the roadside hazard tree guidelines, the alleged improper markings of hazard trees, the impact on woodpeckers and their habitat, and the impact of logging on post-fire soils and watersheds. Thus, Earth Island’s contention that the Service only responded in a generalized manner is factually incorrect. The district court did not abuse its discretion in so finding.
Second, the Forest Service responded extensively to the comments by both Mr. Rhodes and Dr. Royce. The Forest Service responded to Mr. Rhodes’ comments on ground cover loss and landing sites for helicopter and skyline logging in both the body of the FREIS and in the Appendix. Mr. Rhodes disagrees with the Forest Service’s scientific findings, but that disagreement does not render the Forest Service’s review and comment process improper. “[N]one of NEPA’s statutory provisions or regulations requires the Forest Service to affirmatively present every uncertainty in its EIS____After all, to require the Forest Service to [do so] would be an onerous requirement, given that experts in every scientific field routinely disagree----” See McNair, 537 F.3d at 1001. The district court here found just such a “battle of the experts” to exist, but concluded that this did not establish a violation of NEPA. It was within its authority to do so.
Similarly, the RFEIS responded in detail to Dr. Royce’s comments on the roadside hazard tree guidelines. For example, the RFEIS discussed the environmental effects of roadside hazard tree removal and explained why the Forest Service guidelines are consistent with scientific recommendations regarding fire-injured trees. The RFEIS also discusses a concern raised by an Earth Island expert regarding assumptions about the likely fall rates of burned trees. In short, the RFEIS took the required hard look at the determination of which trees were hazardous to road travelers. The Forest Service responded in a sufficiently detailed manner to the range of comments submitted. NEPA requires no more. McNair, 537 F.3d at 1000, 1003. Accordingly, the district court did not abuse its discretion in finding that the Forest Service met its comment period obligations.

Hi. Enforceability of Tree Marking Guidelines

Earth Island contends that the Forest Service did not follow its allegedly enforceable tree marking guidelines. In arguing that the guidelines were binding, Earth Island cites to language from the Record of Decision and the RFEIS stating that the Forest Service shall “[u]se the best available information for identifying dead and dying trees,” that “[h]azard trees proposed for felling have been identified using the PNF Roadside/Facility Hazard Tree Guidelines,” and that the objective of the project is to “[r]emove roadside safety hazards.” The guidelines themselves are contained in a “Roadside/Facility Hazard Tree Abatement Action Plan,” the purpose of which is to “provide parameters for the abatement of road and facility hazard trees.” Further, “[t]he spirit of these guidelines is to: 1) remove those trees that would likely die to abate potential hazards to visitors ... and 2) retain those trees that will likely survive.... This balance aims to retain healthy forest cover....” (Emphasis added). Such language does not make the guidelines enforceable. In *474 order for an agency document to have the force and effect of law, it must “(1) prescribe substantive rules — not interpretive rules, general statements of policy or rules of agency organization, procedure or practice — and, (2) ... [be] promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress.” W. Radio Serv. Co. v. Espy, 79 F.3d 896, 901 (9th Cir.1996) (concluding that agency manual and handbook were not legally enforceable as they were neither substantive in nature nor promulgated in accordance with the Administrative Procedure Act). Here, the language of the guidelines similarly shows that they were not substantive, but provided only internal guidance and parameters for the abatement of danger from hazard trees. Earth Island further fails to show that they were promulgated pursuant to a specific grant of congressional authority. Even if they were enforceable, Earth Island fails to show how the Forest Service failed to observe them given the fact that one of the project purposes was to remove burned trees posing a safety hazard to road traffic in the project area while reestablishing the forest. This balance is precisely what the guidelines call for. Accordingly, the district court did not abuse its discretion in finding that the guidelines were not enforceable.
In short, the district court used the correct standard for analyzing Earth Island’s likelihood of success on the merits and did not abuse its discretion in finding that Earth Island failed to show that it was likely to succeed on the merits of its NFMA claims.

B. Likelihood of Irreparable Harm

Earth Island claims that the district court abused its discretion in conflating the merits and likelihood of irreparable harm inquiries. This argument is unavailing. In one instance, the court referred to Earth Island’s likelihood of success on the merits in connection with its irreparable harm analysis. However, this should come as no surprise as there is significant overlap between these two issues. Winter does not stand for the proposition that courts may never evaluate one factor without looking to another, as Earth Island argues.
Earth Island also contends that the district court failed to realize that both the possible imminence of the alleged harm and the severity thereof must be analyzed under this prong. This argument does find basis in the record. The district court’s analysis shows that the court fully understood and correctly applied this second Winter prong. For example, the court analyzed both whether it was likely or merely possible that the alleged harm would take place. Pointing out that a showing of a mere possibility of irreparable harm is not sufficient under Winter, the court found that Earth Island had, at most, showed such a possibility, but no likelihood of irreparable harm. Further, Earth Island’s argument that logging is per se enough to warrant an injunction because it constituted irreparable environmental harm was squarely rejected by McNair where we declined “to adopt a rule that any potential environmental injury automatically merits an injunction.” 537 F.3d at 1005 (noting that this is particularly so where plaintiffs are also found not likely to succeed on the merits of their claims.).
Finally, Earth Island asserts that the district court abused its discretion in “essentially” requiring it to show that the project would render the entire regional population of woodpeckers unviable. Nowhere did the district court require Earth Island to demonstrate the species-level harm that Earth Island contends.
*475 In short, the district court correctly analyzed the likelihood of irreparable harm in sufficient depth without impermissibly conflating this with the other required factors.

C. Balancing of the Equities and Public Interest

Finally, Earth Island argues that in balancing the equities and considering the public interest, the district court assigned too much weight to the Forest Service’s asserted economic injury, the Forest Service’s risk assessment and the Forest Service’s determination that reforestation was in the public’s interest. To be sure, district courts must “give serious consideration to the balance of equities and the public interest.” Winter, 129 S.Ct. at 368. However, “[a]n injunction is a matter of equitable discretion.” Id. at 381. The assignment of weight to particular harms is a matter for district courts to decide. The record here shows that the district court balanced all of the competing interests at stake. For example, the court stated that whereas “the balance of harms will usually favor the issuance of an injunction to protect the environment,” the law also did not allow it “to abandon a balance of harms analysis just because a potential environmental injury is at issue” and that it “must balance all of the competing interests at stake.”
Earth Island argues that the district court gave too much weight to the economic harm alleged by the Forest Service. It is true that the district court considered the government’s interest in recovering the highest possible value of the timber and providing a boost to the local economy by creating jobs in the local logging industry. However, the district court did not clearly err in finding that the economic stakes, in combination with the safety concerns and reforestation efforts, outweighed any harm to environmental interests. Economic harm may indeed be a factor in considering the balance of equitable interests. See, e.g., Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (concluding that where asserted environmental injury was “not at all probable,” economic interest was properly given more weight); McNair, 537 F.3d at 1005 (holding that the district court did not clearly err in concluding that the balance of harms did not tip in environmental organization’s favor where a Forest Service project would “further the public’s interest in aiding the struggling local economy and preventing job loss.”).
Earth Island further argues that the district court erroneously found that if the injunction were issued, the public would be at risk from falling roadside hazard trees and erred in not considering its request[4] for a tailored injunction that allowed for only the felling of trees in imminent danger of falling. To be sure, district courts have “broad latitude in fashioning equitable relief when necessary to remedy an established wrong.” Sierra Hikers Ass’n v. Blackwell, 390 F.3d 630, 641 (9th Cir.2004). However, courts must always carefully “balance the competing claims of injury.” Winter, 129 S.Ct. at 376. In doing so here, the district court carefully scrutinized both the written record regard *476 ing the fall rates of trees affected by fires as well as the extensive testimony by experts asserting the dangers posed by roadside hazard trees to the general public and forest employees. The court concluded that these safety concerns weighed in favor of not issuing the injunction. It did not abuse its discretion in doing so.
Finally, Earth Island contends that the district court erred in finding that salvage logging was necessary to promote forest regeneration. The court evaluated expert testimony that absent logging of fire-killed and fire-injured trees in combination with the planting of conifer seedlings, brush species would eventually dominate the area resulting in an increase of the cost, difficulty and failure rate of subsequently converting the area into suitable woodpecker habitat. The court concluded that if the injunction was granted, the public would lose the immediate benefits of the reforestation efforts. It did not abuse its discretion in doing so.
CONCLUSION
For the above reasons, the district court correctly denied Earth Island’s motion for a preliminary injunction enjoining the Forest Service’s implementation of the Moonlight-Wheeler project.
AFFIRMED.

. An MIS is a species chosen by the Forest Service to represent a much larger group of native species with similar habitat requirements for environmental assessment purposes. See Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1173 (9th Cir.2006).

. Providing, in pertinent part, that "[i]n order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated.”

. "Population trends of the management indicator species will be monitored and relationships to habitat changes determined. This monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable.”

. This alleged request took the form of Earth Island’s statements on page 24 of its memorandum in support of the preliminary injunction that it did not “object to structurally damaged imminent hazard trees being felled and left on site.” It was thus not the clear request for alternative relief that Earth Island contends. See, e.g. Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1022 (9th Cir.2009) (concluding that the district court had the power to issue a narrow injunction specifically requested by plaintiffs). Regardless, we will address the requested remedy here as if it had been.