# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARTH ISLAND INSTITUTE; CENTER
FOR BIOLOGICAL DIVERSITY,
        *Plaintiffs-Appellants,*

        v.

UNITED STATES FOREST SERVICE;
NANCY GIBSON, in her official
capacity as Forest Supervisor for
the Lake Tahoe Basin Mgt. Unit,
        *Defendants-Appellees.*

No. 11-16718

D.C. No.
2:11-cv-00402-
GEB-DAD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Jr., District Judge, Presiding

Argued and Submitted
May 14, 2012—San Francisco, California

Filed September 20, 2012

Before: Stephen Reinhardt, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

11573

**COUNSEL**

Rachel M. Fazio, Cedar Ridge, California, for the appellants.

Vivian H.W. Wang, U.S. Department of Justice, Environment & Natural Res. Div., Washington, D.C., for the appellees.

## OPINION

N.R. SMITH, Circuit Judge:

Under the National Forest Management Act ("NFMA"), an agency's project is required to comply with 1982 viability requirements only to the extent they have been incorporated in the relevant forest plan. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010). Here, we conclude that the Lake Tahoe Forest Plan did not require the Forest Service to demonstrate at the project level that the Angora Fire Restoration Project ("Angora Project") would maintain viable population levels of management indicator species, including the black-backed woodpecker. Therefore, the Forest Service's analysis of the Angora Project's impact on the black-backed woodpecker's habitat was not arbitrary and capricious under NFMA.

The National Environmental Policy Act ("NEPA") requires an Environmental Assessment ("EA") to comply with certain procedural requirements to ensure that agencies will make informed decisions about the environmental effects of proposed federal actions and to make this information available to the public. *Ecology Center v. Castaneda*, 574 F.3d 652, 656-57 (9th Cir. 2009). Here, because the Forest Service did not fail to (1) ensure the scientific integrity of the final EA, (2) properly respond to dissenting scientific opinion, (3) properly consider proposed alternatives to the Angora Project Environmental Assessment, and (4) take the requisite "hard look" at the impacts of the Angora Project, we also conclude that the Forest Service's analysis of the Angora Project's environmental effects was not arbitrary and capricious under NEPA. Accordingly, we **AFFIRM** the district court.

## I. FACTS AND PROCEDURAL HISTORY

The Forest Service designed the Angora Project in response to damage caused by the Angora Fire, which consumed over

3,100 acres of land. The Forest Service's Lake Tahoe Basin Management Unit ("LTBMU") manages the affected National Forest System land. The LTBMU developed the Angora Project pursuant to the LTBMU Forest Plan in an effort to balance the ecological needs of restoring the ecosystem and protecting area residents and visitors from falling trees and future fires. Project activities include the removal of certain live and dead trees from portions of the forest. The Forest Service determined that, if no action was taken, surface fuels would accumulate as dead and damaged trees fall, increasing the risk of another harmful fire that would threaten both local communities and the forest ecosystem.

Before implementing the Angora Project, the Forest Service prepared an EA and solicited public comment on the EA. The EA discussed the impact of the Angora Project on various species, including black-backed woodpeckers. The EA also responded to some concerns raised in the comments and assessed a "no-action" alternative and the preferred alternative that the Forest Service determined would best reduce fuel loads and the severity of future fires. The Forest Service also briefly considered an option submitted by Earth Island Institute that would limit removal of standing dead trees ("snags") to those greater than 16 inches in diameter. However, the Forest Service dismissed this alternative, because the agency concluded that this alternative would not effectively accomplish the Forest Service's goals.

Subsequently, the Forest Service issued a Decision Notice and a Finding of No Significant Impact ("FONSI"), and it approved the proposed project with some modifications. The decision authorized the removal of snags and downed trees and the thinning of live trees on approximately 1,411 acres. The remaining burned area, consisting of approximately 1,168 acres, would be left untreated to provide habitat diversity in the forest.

The Angora Project also creates twelve "wildlife snag zones" within the treated areas that would be subject to lim-

ited or no snag removal in order to address further concerns about providing habitat for species such as the black-backed woodpecker. The agency determined that about half of the habitat that is suitable for black-backed woodpecker habitat in the relevant area would be retained. The Forest Service concluded that the Project would not "lead to a change in the distribution of black-backed woodpecker[s] across the Sierra Nevada bioregion."

Earth Island Institute and Center for Biological Diversity ("Plaintiffs") filed suit over the Angora Project in 2011, alleging noncompliance with NFMA and NEPA. The district court granted summary judgment in favor of the Forest Service on all claims. Plaintiffs timely appealed the decision. The district court and we both denied Plaintiffs' motions for an injunction pending appeal.

## II.   STANDARD OF REVIEW

The Forest Service is "entitled to deference to [its] interpretation of [its] own . . . Forest Plans[,]" unless the interpretation "is plainly inconsistent with [a Forest Plan]." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (internal quotation marks omitted).

"Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure Act ('APA')." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). "Under the APA, [a court] may set aside an agency decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)).

In *Lands Council II*, we explained that "[r]eview under the arbitrary and capricious standard 'is narrow, and we do not substitute our judgment for that of the agency.' " *Lands Coun-*

*cil v. McNair (Lands Council II)*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (alterations in original omitted) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006)), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Accordingly, an agency's decision can be set aside

> *only if* the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (emphasis added) (internal quotation marks omitted).

We conduct a de novo review of a district court's grant of summary judgment. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

## III.    DISCUSSION

### A.    The Lake Tahoe Forest Plan did not require the Forest Service to demonstrate at the project level that the Angora Project would maintain viable population levels of management indicator species, including the black-backed woodpecker.

[1] Under NFMA, the Secretary was required to promulgate regulations that set out guidelines and standards to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area . . . ." 16 U.S.C. § 1604(g)(3)(B). Accordingly, in 1982 the Forest Service issued planning regulations (known as the 1982 rule) to implement NFMA's viability requirements. The 1982 rule "require[d] the Forest Service to identify and monitor management indicator species ('MIS') and direct[ed] that 'fish

and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species.' " *Castaneda*, 574 F.3d at 657 (quoting 47 Fed. Reg. 43,048 (Sept. 30, 1982)); *see also* 36 C.F.R. § 219.19 (1982). However, the 1982 rule was superseded in 2000. Therefore, "[t]he requirements of the superceded 1982 [r]ule apply *only to the extent they [are] incorporated into*" the relevant forest plan. *Carlton*, 626 F.3d at 470 (quoting *Castaneda*, 574 F.3d at 657 (internal quotation marks omitted)).

**[2]** The language of the LTBMU Forest Plan did not incorporate the 1982 rule's viability requirements. In *Carlton*, 626 F.3d at 470-71, we determined that a forest plan almost identical to the LTBMU Forest Plan did not "clearly" incorporate the viability requirements, because it did not "contain[ ] *specific provisions* regarding wildlife viability." *Compare id.* at 470 (management approach "*will* provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species" (emphasis added) (internal quotation marks omitted)), *with* LTBMU Forest Plan, p. III-22 ("The Forest Service *must* manage habitat to, at the least, maintain viable populations" (emphasis added)). There is nothing significantly different about the words "will" and "must," and certainly any distinction is not obvious enough that the Forest Service's interpretation can be viewed as "plainly inconsistent" with the LTBMU Forest Plan. Therefore, *Carlton* requires that we rule in the Forest Service's favor. *See also Castaneda*, 574 F.3d at 660 ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." (quoting *Terbush v. United States*, 516 F.3d 1125, 1139 n.7 (9th Cir. 2008) (internal quotation marks omitted))); *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1135 (10th Cir. 2007) (holding that the 1982 rules were not incorporated because the "forest plan did not expressly reference the 1982 regulations").

**[3]** Even if the LTBMU Forest Plan's language did incorporate some aspects of the 1982 rule's viability requirements, any species monitoring requirements for viability were expressly incorporated only at the planning level rather than the project level.[1] NFMA and its implementing regulations provide for forest planning and management at two levels: the forest level and at the individual project level. *See* 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the agency develops a forest plan, which is a broad, long-term planning document for an administrative unit of the National Forest System. A forest plan establishes goals and objectives for management of forest resources. 16 U.S.C. § 1604(g)(1)-(3). Here, the relevant forest plan is the LTBMU Forest Plan. At the project level, site-specific projects must be consistent with the applicable forest plan. *Id.* § 1604(i); *Idaho Sporting Cong. Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002). Here, the relevant project is the Angora Project.

Plaintiffs argue that the language in the LTBMU Forest Plan discussing the Forest Service's obligation to "manage habitat to, at the least, maintain viable populations of existing native and desired nonnative species" incorporates the 1982 rule's viability requirements. LTBMU Forest Plan, p. III-22.[2] However, none of the language (on which Plaintiffs rely) contradicts the Forest Service's argument that any requirements

---

[1] A forest plan does not have to incorporate all aspects of the 1982 viability requirements. *See Carlton*, 626 F.3d at 472 ("[O]nly the aspects of § 219.19 in the 1982 planning rule related to *selecting MIS* (§ 219.19(a)(1)) and *monitoring* during forest plan implementation (§ 219.19(a)(6)) apply. *Other aspects of § 219.19* are related to forest plan development or revision and *do not apply*." (internal quotation marks omitted)).

[2] *See also* LTBMU Forest Plan, p. IV-11 ("Viable populations of native and desired nonnative species will be maintained through active vegetative management and other methods."); LTBMU Forest Plan, p. IV-26 ("The primary purpose is to perpetuate viable populations of wildlife species native to the area through management of their habitat . . . .").

regarding the monitoring and assessment of population trends have only been incorporated at the planning level. In fact, one of the provisions from the 2007 Amendment to the Forest Plan cited by Plaintiffs specifically disavows such a project-level requirement. It states, "[t]he viability requirements at the *planning area scale* are described under the first paragraph of the 1982 36 CFR § 219.19; these have *already been met in each forest plan*, as revised." 2007 Amendment FEIS, p. 338 (emphasis added). For "project level analysis . . . [t]here is *no requirement* to 'track trends of species to evaluate viability.' " *Id.*

In response, the Forest Service also cites to other provisions that illustrate that the agency's only project-level duty with respect to MIS is to ensure that the project record "contain[s] a discussion of the effects of the alternatives on the MIS habitat(s) that will be directly affected by the Forest Service action." 2007 Amendment Record of Decision, p. 14; *see also id.* at 11 ("The sole MIS requirement that is applied at the project level is the assessment of habitat for MIS. . . . There are no MIS monitoring requirements in the project area or at the project level."). Therefore, because the Forest Service determined that the Angora Project would not significantly impact the black-backed woodpecker's habitat, the Forest Service complied with any project-level viability requirements.

Plaintiffs reply, arguing that the passages relied on by the Forest Service only refer to monitoring, and that the Forest Service should still be required to analyze the "quantity and quality of habitat necessary" to support the black-backed woodpecker. However, this argument misunderstands the relationship between monitoring and viability trend assessment requirements. To understand this relationship, one must analyze the language of 36 C.F.R. § 219.19 (1982), and our case law analyzing this regulation. We agree with the Plaintiffs that the text of the 1982 regulation requires that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing . . . species in the planning area." 36

C.F.R. § 219.19 (1982). But one of the primary methods, through which the regulation requires that this viability management be accomplished, is through the *monitoring of population trends* of management indicator species. The regulation states:

> To meet this [viability] goal, management planning for the fish and wildlife resource shall meet the [following] requirements . . . certain . . . species present in the area shall be identified and selected as management indicator species . . . . *Population trends of the management indicator species will be monitored* and relationships to habitat changes determined.

*Id.* § 219.19(a)(1), (6) (1982) (emphasis added).

Where a forest plan requires the Forest Service to monitor population trends at the project level, our case law has allowed the Forest Service to substitute direct monitoring of the species population trends with an analysis of the "type and quantity of habitat" that is necessary to support that species. This is sometimes referred to as "habitat monitoring," or the proxy-on-proxy approach. For instance, in *Native Ecosystems Council v. U.S. Forest Service*, we explained that "the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the [indicator] species" can be used "as a proxy for population monitoring of the management indicator species." 428 F.3d 1233, 1250-51 (9th Cir. 2005); *id.* at 1251 ("We have, in appropriate cases, allowed the Forest Service to avoid studying the population trends of the Indicator Species by using Indicator Species habitat as a proxy for Indicator Species population trends in a so-called 'proxy on proxy' approach." (internal quotation marks omitted)); *accord Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 933 (9th Cir. 2010) ("The proxy-on-proxy approach effectively allows the Forest Service to avoid studying the population trends of the Indicator Species by using Indicator Species habitat as a

proxy for Indicator species population trends." (internal quotation marks omitted)).

Thus, it is contradictory for Plaintiffs to admit in their briefs and at oral argument that monitoring is not required, but then to argue that the Forest Service must still analyze the "quantity and quality of habitat necessary" to support the black-backed woodpecker, because that type of analysis *is* monitoring: habitat monitoring, to be specific. *See Alliance for Wild Rockies v. Kimbell*, 310 F. App'x 106, 108-09 (9th Cir. 2009) (describing "habitat monitoring" where the Forest Service describes the "quantity and quality of habitat that is necessary to sustain the viability of the species group in question" (alteration in original omitted) (internal quotation marks omitted)).

[4] It is also unsurprising that Plaintiffs are unable to cite to any case where the forest plan expressly disavowed a monitoring requirement at the project level, and yet the court still required the Forest Service to engage in project-level habitat monitoring by identifying the appropriate quantity and quality of MIS habitat. Indeed, in *Tidwell,* this court explained that the "proxy-on-proxy result" aimed at establishing species population trends is only required in situations such as where "the forest plan requires monitoring of the MIS." 599 F.3d at 933-34. The Forest Plan in *Tidwell* was markedly different from the LTBMU Forest Plan, because it required monitoring without limiting this requirement to the planning level. *See id.* at 932-33 ("Viable populations of all existing wildlife species will be maintained by providing a diversity of habitats throughout the Forest. Wildlife indicator species have been identified and *will be monitored to ensure that assumptions concerning the effects of management activities on wildlife habitat and populations are appropriate.*" (emphasis added)). Thus, because monitoring is equivalent to either analyzing viable population trends or "describing the quality and quantity of habitat necessary to sustain the viability of" the black-backed woodpecker, *Lands Council II*, 537 F.3d at 997-99,

and because the LTBMU Forest Plan expressly disavows this requirement at the project level, the Forest Service's decision to not engage in that analysis for the Angora Project was not arbitrary and capricious.

Indeed, we have already rejected very similar arguments in *Earth Island Institute v. Carlton*, in which the same Plaintiff challenged another Forest Service project. 626 F.3d at 470-71. The *Carlton* court analyzed the language of the amendment to the forest plan and determined that "the [viability] requirement pertains to the planning area, *not the project area at issue in this case*." *Id.* at 471 (emphasis added). In reaching this conclusion, we analyzed virtually identical language to the language from the 2007 Amendment to the Sierra Nevada Framework Plan in this case. *Compare Carlton*, 626 F.3d at 470-71 (the "sole MIS requirement that is applied at the project level is the assessment of habitat for MIS" and "there are no monitoring requirements for MIS at the project level" (internal quotation marks omitted)), *with* 2007 Amendment Record of Decision, p. 11 ("The sole MIS requirement that is applied at the project level is the assessment of habitat for MIS. . . . There are no MIS monitoring requirements in the project area or at the project level.").

Plaintiffs attempt to distinguish *Carlton* by arguing that the case analyzed only subsequent, region-wide amendments and "said nothing about whether an individual forest plan . . . contains a viability requirement." We do not find that distinction persuasive, because the issue in *Carlton* was still whether these amendments had incorporated the 1982 rule into a specific forest plan. *Carlton*, 626 F.3d at 470-71. Moreover, the analysis in *Carlton* was not based on the type of document it was analyzing, but rather the type of language in the amendments. We made clear that the general viability language was not enough to incorporate the 1982 rules. *Id.* Plaintiff's argument is further belied by the dissent in *Carlton*, which discussed the binding effect of the viability language in the amendments on the individual forest plan at issue. *Id.* at 480

(Reinhardt, J., dissenting) ("The Forest Service's decision to simply ignore a binding viability requirement in the Plumas National Forest Plan violates the NFMA.").

Plaintiffs cite to *Lands Council II* and *Castaneda* in support of their arguments. But neither of these cases control the outcome here, because they only discussed the *method* for agencies to comply with viability assessment requirements, rather than the *threshold* for when an agency is required to comply with these requirements. *See Lands Council II*, 537 F.3d at 988-89 (the parties did not contest the forest plan's requirement to "manage the habitat of species" that were listed "to prevent further declines in populations;" the parties merely contested whether these duties had been fulfilled (internal quotation marks omitted)); *Castaneda*, 574 F.3d at 663 (the parties did not contest the Forest Service's requirement "to measure [p]opulation levels of old-growth dependent species" to "[m]aintain viable population[s] of old-growth dependent species;" the parties merely contested whether these duties had been fulfilled (alterations in original) (internal quotation marks omitted)).[3]

Plaintiffs also argue that the Forest Service's interpretation would allow projects to not comply with governing forest plans, which would contravene 16 U.S.C. § 1604(i). *See also Lands Council II*, 537 F.3d at 989 ("After a forest plan is developed, all subsequent agency action, including site-specific plans . . . must comply with the NFMA and be consistent with the governing forest plan."). However, the Forest Service's interpretation is consistent with any viability requirements at the planning level in the LTBMU Forest Plan. Though the Forest Service was not required to engage in mon-

---

[3]Plaintiffs also cite to two other cases that are irrelevant because they were evaluating projects developed when the 1982 regulations were still in effect, rather than the 2000 regulations that apply to the Angora Project. *See Tidwell*, 599 F.3d at 932 & n.8; *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007).

itoring (either of habitat or indicator species) at the project level, the Forest Service did engage in other viability management activities for the black-backed woodpeckers by disclosing the impacts the Angora Project will have on the black-backed woodpecker's habitat.

In the final EA, the Forest Service explained that the Angora Project "would not alter the existing trend in the ecosystem component, nor would it lead to a change in the distribution of black-backed woodpecker across the Sierra Nevada bioregion." Furthermore, the EA discusses the amount of habitat that would be affected by treatment, and the amount of habitat in the project-area left to the black-backed woodpecker. The EA also explains the many ways that the Forest Service monitors the black-backed woodpecker at the planning level. The EA notes that the Forest Service's analysis was "informed by both habitat and distribution population monitoring data" that occurs at the planning level.[4]

In *Lands Council II*, 537 F.3d at 995-96, we recognized that these types of activities fulfilled the 1982 viability requirements. For instance, we noted the fact that "[m]onitoring surveys" at the planning "confirm[ed] that owls are using" and were present in their historic habitat areas. *Id.*

---

[4]It appears that MIS monitoring occurred when the LTBMU Forest Plan was originally drafted, and it continues to occur annually and whenever the plan is revised. *See* Lake Tahoe Basin Mgt. Unit, *Planning*, http://www.fs.usda.gov/main/ltbmu/landmanagement/planning (last visited Aug. 10, 2012) (explaining that annual monitoring and comprehensive evaluation informs the need for revising the forest plan); LTBMU Forest Plan V-1, *available at* http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5114537.pdf (describing planning-wide monitoring activities).

If Earth Island wishes to challenge the Forest Service's planning-level monitoring techniques, as set forth in documents such as the LTBMU plan, such a claim is not appropriate for the present suit. Here, this court is merely asked to determine whether the EA for the Angora Project was arbitrary and capricious.

at 995 (internal quotation marks omitted). Also similar to this case, we noted the Forest Service's conclusion that the owls would "be able to maintain their current *distribution*" also fulfilled viability requirements. *Id.* at 997 (emphasis added). In addition, as here, the Forest Service's conclusion that the agency action would not "contribute to a trend toward a 'Federal listing' under the Endangered Species Act" also fulfilled viability requirements. *Id.* at 996.

Finally, even assuming there is ambiguity about whether the LTBMU Forest Plan incorporated the 1982 viability requirements, the Forest Service is "entitled to deference to [its] interpretation of [its] own . . . Forest Plans[,]" unless the interpretation "is plainly inconsistent with [a Forest Plan]." *Native Ecosystems Council*, 418 F.3d at 960; *Castaneda*, 574 F.3d at 661 (if there is "ambiguity . . . we defer to the Forest Service's reasonable interpretation of the Forest Plan's requirements"). A court "will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Lands Council II*, 537 F.3d at 994.

**[5]** Reviewing the LTBMU Forest Plan's requirements with deference to the agency, and given the absence of case law in support of Plaintiff's arguments, the Forest Service surely did not make "a clear error in judgment in concluding" that the LTBMU Forest Plan did not require it to assess the "quantity and quality of habitat necessary" to support the black-backed woodpecker at the project level. *Id.* at 994. As a result, the Forest Service's actions of discussing the impact of the Angora Project on the black-backed woodpecker's habitat were not arbitrary and capricious under NFMA. Such a holding "comports with our reluctance to require an agency to show us, by any particular means, that it has met the requirements of NFMA every time it proposes action." *Id.* at 992.

## B.   The Angora Project EA was not arbitrary and capricious under NEPA.

NEPA sets forth procedural (rather than substantive) requirements for agency decision-makers. NEPA seeks to ensure that agencies will make informed decisions about the environmental effects of proposed federal actions and to make this information available to the public. *See Castaneda*, 574 F.3d at 656-57. Pursuant to NEPA's implementing regulations, an agency may prepare an EA to determine whether a proposed action may significantly affect the quality of the environment such that the agency needs to prepare a more detailed Environmental Impact Statement ("EIS"). *See* 40 C.F.R. §§ 1501.4(b), 1508.9. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [FONSI]." *Id.* § 1508.9(a)(1); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 954 (9th Cir. 2008).

The Forest Service's analysis of environmental effects in the Angora Project EA was not arbitrary and capricious under NEPA, because the agency did not fail to (1) ensure the scientific integrity of the final EA, (2) properly respond to dissenting scientific opinion, (3) properly consider proposed alternatives to the Angora Project in the final EA, or (4) take the requisite "hard look" at the impacts of the Angora Project.

### 1.   Scientific Integrity

[6] NEPA requires that "[a]gencies shall insure the professional integrity including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. By its terms, this regulation only applies to preparation of an EIS, but the Forest Service does not dispute that this scientific integrity requirement applied to their EA. Therefore, we assume without deciding that this requirement does in fact apply to the Angora Project EA.

The EA's assertion about black-backed woodpecker distribution is as follows: "[D]ata indicate that the black-backed woodpecker continue to be *distributed* across the Sierra Nevada; current data at the rangewide, California, and Sierra Nevada scales indicate that the *distribution* of black-backed woodpecker populations in the Sierra Nevada is stable." These data were gathered by monitoring that takes place at "various sample locations by avian point counts, spot mapping, mist-netting, and breeding bird survey protocols."

**[7]** Plaintiffs argue that the Forest Service failed to ensure the scientific integrity of the final EA by misrepresenting the facts regarding trends in the black-backed woodpecker's population. However, this argument is based on an incorrect premise, because the agency was citing the studies primarily in regard to the historic *geographic distribution* of black-backed woodpeckers rather than population trend statistics. Though the Forest Service listed a range-wide population trend index (and noted the credibility problems with the data), the Forest Service was primarily making a claim about the geographic distribution of the black-backed woodpecker and whether the distribution was stable.

The California Partners in Flight ("CPIF") 2002 report supports the Forest Service's claims about distribution. The report provides a map (citing to other sources) that indicates the locations where black-backed woodpeckers have been detected in recent years in relation to their historic distribution. The Forest Service also cited to a 25-year study that concluded: "The data from these various sources indicate that black-backed woodpeckers continue to be distributed across the Sierra Nevada." Dist. Ct. Op. at 14. The Siegel and Kaschube study indicates that black-backed woodpeckers were captured at five monitoring stations operated in the Sierra Nevada between 1992 and 2005. The Forest Service also asserts that other studies cited were intended to "contextualize population information through a variety of spatial scales."

**[8]** The data sufficiently supports the agency's claim about black-backed woodpecker population distribution. Thus, the Forest Service was not arbitrary and capricious in failing to fulfill the requirement of "insur[ing] the professional integrity, including scientific integrity, of [its] discussions and analyses . . . ." 40 C.F.R. § 1502.24. Furthermore, "[b]ecause analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003). Finally, "reviewing court[s] may not 'fly speck' an [EA] and hold it insufficient on the basis of inconsequential, technical deficiencies." *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987). Thus, the Angora Project EA's analysis was not arbitrary and capricious with regard to NEPA's scientific integrity requirements.

## 2.   Responses to Dissenting Opinions

**[9]** In the context of environmental impact statements, NEPA requires agencies to respond explicitly and directly to "responsible opposing view[s]." 40 C.F.R. § 1502.9(b) ("§ 1502.9(b)"). Plaintiffs argue that the Forest Service violated that requirement here by not appropriately responding to four comments submitted by Dr. Chad Hanson in response to the initial EA. However, we conclude that the Forest Service was not required by § 1502.9(b) to respond to Dr. Hanson's comments, because the regulation by its own terms only applies this requirement to "[f]inal environmental impact statements," 40 C.F.R. § 1502.9(b). As a general rule, courts should not impose new requirements on agencies not imposed by the APA or a substantive statute. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council Inc.*, 435 U.S. 519, 549 (1978) (a court should not "impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good"); *see N. Slope Borough v. Minerals Mgmt. Serv.*, 343 F. App'x. 272, 275 (9th Cir. 2009) ("The duty to disclose and respond to 'respon-

sible opposing viewpoints' imposed by 40 C.F.R. § 1502.9(b) applies only to environmental impact statements, not environmental assessments."); *see also Greenpeace, Inc. v. Cole*, 445 F. App'x 925, 928 n.4 (9th Cir. 2011).

Although the Plaintiffs cite to *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1245 n.6 (9th Cir. 1984), for the proposition that both EAs and EISs are required to respond to dissenting views, this case is not controlling here. *Save Our Ecosystems* was a case based on a finding that the agency's EA was the "functional equivalent of an EIS." 747 F.2d at 1247 ("When an EA is the functional equivalent of an EIS, it is subject to the same procedures."). Plaintiffs have not argued in this case that the EA is the functional equivalent of an EIS. Thus, Plaintiffs rely on no authority for the proposition that § 1502.9(b) applies to an EA that is not the functional equivalent of an EIS.[5]

Furthermore, even if the Forest Service were required to comply with the requirements of § 1502.9(b) and respond to dissenting views, the Forest Service did not fail to meet that requirement in an arbitrary and capricious manner here. As the district court noted, the Forest Service responded to Dr. Hanson's comments concerning the Hutto and Gallo study by discussing the finding of that study. The agency also responded in the FONSI to Dr. Hanson's comments concerning the distribution of black-backed woodpecker populations when the Forest Service stated, "[m]onitoring data indicate that black-backed woodpeckers continue to be distributed across the Sierra Nevada; current data at the range-wide, California, and Sierra Nevada scales indicate that the distribution of black-backed woodpecker populations in the Sierra Nevada

---

[5]Plaintiffs also cited to two other cases for support that did not even mention the applicability of 40 C.F.R. § 1502.9(b). *See Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998), *overruled by Lands Council II*, 537 F.3d 981; *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1508-09 (9th Cir. 1997).

is stable." Dist. Ct. Op. at 16. The comment also directed the reader to other areas of the EA that contained further discussion of this issue. Finally, the Forest Service responded both in the final EA and the FONSI to Dr. Hanson's comments concerning the viability of the black-backed woodpecker. The Forest Service stated that "[t]he forecast for increasing stand replacing fires for the foreseeable future across a significant part of the western United States indicates an increase in black-backed woodpecker habitat availability for continued [black-backed woodpecker] population growth." *Id.* The agency also said that a request for a comprehensive assessment of the viability of the black-backed woodpecker "is beyond the scope of this analysis. . . . MIS are monitored at the Sierra Nevada bioregional scale. Information gathered at the bioregional scale is ongoing, will continue over multiple years and will support conclusions made about species status and trends." *Id.*

In addition, Plaintiffs cannot use the notice and comment procedure as a back-door method of forcing the 1982 species viability assessment requirements on the Forest Service. As discussed above, the Forest Plan does did not itself incorporate these requirements, and thus the NFMA does not require such analysis here.

**[10]** Though the Forest Service did not perform the point-by-point type of counter-argument to experts that Plaintiffs appear to desire, our precedent makes clear that an agency "need not respond to every single scientific study or comment." *See Castaneda*, 574 F.3d at 668 (addressing duty to respond to opposing views in an EIS). Furthermore, even if Plaintiffs disagree with the agency's responses, "that disagreement does not render the Forest Service's review and comment process improper." *Carlton*, 626 F.3d at 473. Therefore, even if response to dissenting views was required, the Forest Service's responses were not arbitrary and capricious.

### 3.   Consideration of Proposed Alternatives

**[11]** We conclude that the Forest Service's consideration of a no action alternative and its preferred action was not arbitrary and capricious under the less rigorous requirements of an EA (rather than an EIS). In *Native Ecosystems Council*, 428 F.3d at 1246, we "join[ed] our sister circuits in holding that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." Since that decision, we are aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and preferred action alternative.

For instance, in *Native Ecosystems Council*, we explained that NEPA's implementing regulations merely require an EA to include consideration of appropriate alternatives, including "a 'no action' alternative" and "the agency must designate a 'preferred' alternative." *Id.* at 1245-46 (citing 40 C.F.R. § 1502.14(a), (d), and (e)). Beyond that, NEPA's "statutory and regulatory requirements . . . do[ ] not dictate the minimum number of alternatives that an agency must consider." *Id.* at 1246. Therefore, in *Native Ecosystems Council*, we upheld "the Forest Service's consideration of a 'no action' alternative and its 'preferred' alternative," even though no other alternatives were considered in detail. *Id.* at 1249.

Similarly, in *North Idaho Community Action Network v. U.S. Department of Transportation*, 545 F.3d 1147, 1154 (9th Cir. 2008) (per curiam), we held that the agency had "fulfilled [its] obligation[ ] under NEPA's alternatives provision when [it] considered and discussed only two alternatives in the . . . EA." These two alternatives were identical to those in this case: "the Project with the changes proposed in the . . . EA, and the Project without the proposed changes . . . ." *Id.* at 1153. Notably, in *North Idaho Community Action Network*, we did not even discuss the other alternatives the agency had rejected and whether the agency had provided sufficient reasons for rejecting the alternatives. We merely explained that,

because the forest service "briefly discussed two alternatives," and because "the Project proposed in the 2005 EA will not result in significant environmental effects," the analysis was sufficient. *Id.* at 1153-54.

Here, the Forest Service explained that its proposed alternative was better at accomplishing its goals than Plaintiffs' proposed alternative was. *See Native Ecosystems Council*, 428 F.3d at 1247 ("Alternatives that do not advance the purpose of [a project] will not be considered reasonable or appropriate."). Plaintiffs argue that the Forest Service did not properly dismiss the 16-inch alternative, because it was analyzed under a higher estimate of snag fall rate. Plaintiffs argue that this skewed the results, because an assumption of higher snag falls was not used to analyze other alternatives.

**[12]** However, even without assuming a higher snag fall rate, the Forest Service has offered a reasonable explanation for how its preferred alternative better accomplished its goal of reducing the risk of severe fires than Plaintiffs' proposed alternative. The Forest Service explained that, "[e]ven under a less conservative assumption of snag fall rates than 'all snags fall,' the alternative proposed by Earth Island would result in fuel loadings" beyond the Forest Service's desired limit. "Therefore, leaving an additional 2 to 40 large snags per acre, weighing more than one ton per tree, would not achieve the Project objective of reducing the risk of a severe fire."[6] The Forest Service also explained in the EA itself that the Plaintiff's proposed alternative was not as effective at accomplishing its goal of preventing fire danger because allowing more snags to stand would "contribute to high fuel loads" within five to ten years.

---

[6]Although Plaintiffs also argue that their proposed 15-inch or 16-inch alternatives would have accomplished the Forest Service's goals more effectively than the "no action" approach, this argument is irrelevant, as an agency is always required to consider a "no action" approach. *See Native Ecosystems Council*, 428 F.3d at 1245-46.

The Forest Service's argument is consistent with our previous reasoning in *Native Ecosystems Council*, that "it makes no sense" for agencies "to consider alternatives that do not promote the goal" or the "purpose" the agency is trying to accomplish. 428 F.3d at 1248 (internal quotation marks omitted). Thus, we held that "[w]hen the purpose of the . . . Project is to reduce fire risk, the Forest Service need not consider alternatives that would increase fire risk." *Id.*

Similarly, a Fifth Circuit case has explained that "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994) (internal quotation marks omitted). Moreover, in *Louisiana Crawfish Producers Ass'n-West v. U.S. Army Corps of Engineers*, 463 F.3d 352, 356-57 (5th Cir. 2006), the Fifth Circuit explained that the Army Corps was not required to explain in its EA why it had rejected an alternative, when that alternative resulted in sedimentation above the Army Corps' desired goal. The court reasoned that there is "no case law" that "require[s an agency] to consider and reject [a] proposed alternative in [an] EA." *Id.* at 356. Further, "the range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial." *Id.* at 357 (alteration in original) (internal quotation marks omitted). Therefore, the court relied on the arguments "the Corps has *briefed* [discussing] why the proposal was not accepted" to determine that the "Corps was not arbitrary and capricious in choosing to reject the [plaintiff's] proposed alternative." *Id.* (emphasis added).

**[13]** The concerns that Plaintiffs raise all rely on authority dealing with the more stringent analysis requirements for an EIS. However, under the less stringent analysis requirements for an EA, the Forest Service's consideration of alternatives was not arbitrary and capricious.

### 4.   Requisite "Hard Look" at Impacts

**[14]** Plaintiffs argue that the Forest Service failed to take a "hard look" at the Angora Project's impact on black-backed woodpeckers and future fire behavior. Plaintiffs rely on the Forest Service's "analytical failings as a whole" in the EA in support of this argument. However, because we do not agree that the alleged analytical failings of the Forest Service were arbitrary and capricious, Plaintiffs have not demonstrated that the Forest Service's analysis overall failed to take the required hard look under NEPA.

## IV.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision.