**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| OREGON NATURAL DESERT ASSOCIATION; CENTER FOR BIOLOGICAL DIVERSITY, *Plaintiffs-Appellants*, | No. 18-35514 |
| v. | D.C. No. 3:03-cv-00213-PK |
| UNITED STATES FOREST SERVICE; ROGER W. WILLIAMS, Malheur National Forest Supervisor, *Defendants-Appellees*, | OPINION |
| and | |
| JEFF HUSSEY; SHERRI HUSSEY; MARK JOYCE; WENDY L. JOYCE; ANTHONY W. JOYCE; KATHERINE JOYCE; J&M COOMBS LLC; CHARLES DUNTEN; DARWIN DUNTEN; JOHN AHMANN; JUDY AHMANN; ELDER RANCH, INC.; JOSEPH CRONIN; GAY CRONIN; NORMAN ENGEBERG; JULIEANN ENGEBERG, *Intervenor-Defendants-Appellees.* | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted February 6, 2020
Seattle, Washington

Filed May 1, 2020

Before:  MILAN D. SMITH, JR. and N. RANDY SMITH,
Circuit Judges, and JOHN R. TUNHEIM,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Environmental Law / Grazing Permits

The panel affirmed the district court's grant of summary judgment for the U.S. Forest Service and intervenors in an action challenging the Forest Service's issuance of grazing authorizations between 2006 and 2015 on seven allotments in the Malheur National Forest.

The panel held that plaintiffs' challenge to the contested grazing authorizations was justiciable.  Specifically, the panel held that plaintiffs' challenge was sufficiently ripe where they challenged a discrete agency action that was harmful to them.  Second, the panel held that the dispute was not moot where the challenge concerned the cumulative

---

[*] The Honorable John R. Tunheim, United States Chief District Judge for the District of Minnesota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

effects of grazing on bull trout habitats and was a sufficiently live controversy which the court could address.

The panel rejected plaintiffs' procedural challenge. Because the Forest Service was not obligated by statute, regulation, or caselaw to memorialize each site-specific grazing authorization's consistency with the Forest Plan, the absence of such a document was not in itself arbitrary and capricious under the Administrative Procedure Act and the National Forest Management Act ("NMFA").

The panel construed plaintiffs' appeal as implicitly challenging the substantive consistency of the challenged grazing authorizations as well.

Inland Native Fish Strategy (INFISH) Standard GM-1 requires the agency to modify its grazing practices to the extent they prevent attainment of Riparian Management Objectives or are likely to adversely affect inland native fish. The panel deferred to the Forest Service's expertise in determining whether, given the many factors at play, and given its extensive monitoring and enforcement activities protecting bull trout habitats, it must modify or suspend grazing activity in order to comply with Standard GM-1. The panel held that the Forest Service did not act arbitrarily or capriciously with respect to the NFMA's consistency requirement as applied to Standard GM-1 in issuing any of the challenged grazing authorizations.

Forest Plan Management Area 3A Standard 5 provides the necessary habitat to maintain or increase populations of management indicator species. The panel held that the Forest Service's ongoing site-specific monitoring, analysis, and enforcement activities aimed at protecting and improving bull trout habitats were reasonable means of

ensuring consistency with Standard 5.  The panel concluded
that the Forest Service did not act arbitrarily or capriciously
with respect to Standard 5 in issuing any of the challenged
grazing authorizations.

## COUNSEL

Peter M. Lacy (argued), Oregon Natural Desert Association,
Portland, Oregon; Stephanie M. Parent, Center for
Biological Diversity, Portland, Oregon; David H. Becker,
Law Office of David H. Becker LLC, Portland, Oregon; for
Plaintiffs-Appellants.

Brian C. Toth (argued), Attorney; United States Department
of Justice, Washington, D.C.; Stephen J. Odell, Assistant
United States Attorney; Billy J. Williams, United States
Attorney; Jeffrey B. Clark, Assistant Attorney General;
United States Attorney's Office, Portland, Oregon; Val M.
McLam Black, Senior Counsel; Stephen Alexander Vaden,
General Counsel; Office of the General Counsel, United
States Department of Agriculture, Portland, Oregon; for
Defendants-Appellees.

Scott W. Horngren (argued) and Caroline Lobdell, Western
Resources Legal Center, Portland, Oregon, for Intervenor-
Defendants-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

Plaintiffs-Appellants Oregon Natural Desert Association and Center for Biological Diversity (collectively, ONDA) appeal the district court's grant of summary judgment for Defendants-Appellees United States Forest Service and Roger W. Williams, Malheur National Forest Supervisor (collectively, the Forest Service). ONDA challenges the Forest Service's issuance of grazing authorizations between 2006 and 2015 on seven allotments in the Malheur National Forest (MNF). ONDA argues that the Forest Service acted arbitrarily and capriciously in its application of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and the National Forest Management Act (NFMA), 16 U.S.C. § 1604(i), when it failed to "analyze and show" that the grazing authorizations were consistent with the MNF Land and Resource Management Plan (Forest Plan).[1]

While we agree with ONDA that this case is justiciable, we hold that the Forest Service met its procedural and substantive obligations pursuant to the NFMA and the APA in issuing the challenged grazing authorizations, and we affirm the district court's grant of summary judgment for the Forest Service.

---

[1] This case also involves Intervenors-Defendants-Appellees Jeff Hussey et al. (collectively, Intervenors), a group of ranchers whose cattle graze on the allotments in question. For simplicity, we refer only to Defendant Forest Service except where it is necessary to distinguish Intervenors.

## FACTS AND PROCEDURAL BACKGROUND

## I.  Livestock Grazing in the Malheur National Forest

The Malheur and North Fork Malheur Rivers flow from Eastern Oregon's Blue Mountains to join the Snake River at the Idaho border.  The rivers are home to the bull trout, the regional population of which was listed as a threatened species pursuant to the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, in 1998.  Determination of Threatened Status for the Klamath River and Columbia River Distinct Population Segments of Bull Trout, 63 Fed. Reg. 31,647, 31,647 (June 10, 1998).  The bull trout population along the Malheur and North Fork Malheur Rivers has been in continuous decline over the past century. To thrive, bull trout require cold water temperatures, clean water quality, complex channel characteristics, and well-connected migratory pathways.  Livestock grazing activity can damage bull trout habitat by removing cooling riparian vegetation, eroding or collapsing streambanks, widening stream channels, and degrading water quality.

The Forest Service manages the MNF, which includes parts of the Malheur and North Fork Malheur Rivers, pursuant to the 1990 Forest Plan.  The NFMA, and the regulations promulgated pursuant to its authority, provide for the creation of forest plans and define their important role in the Forest Service's management of national forests. *See* 16 U.S.C. § 1604; 36 C.F.R. Part 219.  The NFMA directs the Forest Service to assure that its forest plans provide for and sustainably balance multiple uses of the forest including outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness uses.  16 U.S.C. § 1604(e)(1); *see also The Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008) (en banc) ("Congress has consistently acknowledged that the Forest Service must balance competing demands in

managing National Forest System lands."), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  The NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the [forest] plans." 16 U.S.C. § 1604(i).

In 1995, the Forest Service adopted the Inland Native Fish Strategy (INFISH), providing interim direction in the management of inland fish habitats in Eastern Oregon and surrounding areas.  Notice of Decision, 60 Fed. Reg. 39,927, 39,927 (Aug. 4, 1995).  INFISH establishes six Riparian Management Objectives (RMOs) which are used to measure the Forest Service's progress in achieving INFISH's goals: bank stability, lower bank angle, stream width-to-depth ratio, pool frequency, large woody debris, and water temperature.  A 1995 Forest Service Decision Notice and Finding of No Significant Impact (Decision) amended the region's forest plans to incorporate the INFISH standards.

Livestock grazing in the MNF, pursuant to a permitting regime established by the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1752, is subject to the Forest Plan as amended by INFISH.  As part of its grazing program, the Forest Service issues 10-year grazing permits and yearly "Annual Operating Instructions" (AOIs) (collectively, grazing authorizations) for specified allotments.[2]  While grazing permits contain general limitations on the amount and intensity of grazing allowed for the allotment in question, AOIs provide detailed yearly

---

[2] The Forest Service can also develop Allotment Management Plans (AMPs) to govern livestock operations generally within a specific grazing allotment.  43 U.S.C. § 1752(d); 36 C.F.R. § 222.1(b)(2).  No AMPs are at issue in this appeal.

directives to the ranchers for their grazing allotments, including scheduled pasture rotations, authorized number of livestock, and timing restrictions. Both grazing permits and AOIs include "move triggers," like grass stubble height and stream bank alteration, which indicate, based on physical measurements of grazing impacts, when livestock needs to be moved to other grazing areas. As part of this litigation, in 2006 we ruled that AOIs are "final agency actions" subject to review pursuant to the APA. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.* (*ONDA I*), 465 F.3d 977, 990 (9th Cir. 2006).

## II. ONDA's Litigation with the Forest Service

This litigation started in 2003, when ONDA sued the Forest Service to challenge grazing practices in the MNF. In 2016, after years of parallel litigation and failed settlement discussions, ONDA filed its fifth amended complaint, alleging that 117 Forest Service grazing authorizations, issued from 2006 through 2015, violated the NFMA, and, by extension, the APA.[3] The challenged grazing authorizations include 11 grazing permits, 5 grazing permit modifications, and 101 AOIs on seven allotments along the Malheur and North Fork Malheur Rivers.

ONDA ultimately moved for summary judgment requesting (1) declaratory relief as to all challenged grazing authorizations, and (2) injunctive relief barring livestock grazing in bull trout critical habitat and certain other areas until the Forest Service could demonstrate compliance with the Forest Plan. The Forest Service and Intervenors cross-moved for summary judgment. On April 16, 2018, the district court, adopting the findings and recommendations of

---

[3] ONDA also alleged violations of the Wild and Scenic Rivers Act which are not before us on appeal.

the magistrate judge, granted summary judgment for the Forest Service and Intervenors on all claims, and dismissed the action with prejudice.

On appeal, ONDA argues that the grazing authorizations were unlawful because the Forest Service failed to analyze and show their consistency with the following two Forest Plan standards:

- **INFISH Standard GM-1 (Standard GM-1):** Modify grazing practices (e.g., accessibility of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent attainment of Riparian Management Objectives or are likely to adversely affect inland native fish. Suspend grazing if adjusting practices is not effective in meeting Riparian Management Objectives.

- **Forest Plan Management Area 3A Standard 5 (Standard 5):** Provide the necessary habitat to maintain or increase populations of management indicator species: bull trout, cutthroat trout, and rainbow/redband trout.

With respect to Standard GM-1, INFISH defines "retard attainment" as "to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system." In the analogous context of the PACFISH guidelines, which contain a standard nearly identical to Standard GM-1, the Forest Service interpreted "retard attainment," to require "limit[ing] [grazing's] environmental effects to those *that do*

*not carry through to the next year*, thereby avoiding cumulative, negative effects."[4]

## JUSTICIABILITY

While we agree with the parties that 28 U.S.C. §§ 1291 and 1331 provide us with statutory jurisdiction over this case, the Forest Service separately argues that ONDA's challenge to the contested grazing authorizations is not justiciable pursuant to the doctrines of ripeness and mootness. We address each argument in turn and find that ONDA's challenge is justiciable.

## I.  Ripeness

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) clarifies that a party cannot challenge an entire agency management regime under the auspices of the APA: "[plaintiffs] cannot seek *wholesale* improvement of [a] program by court decree, rather than in the offices of the [Forest Service] or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891. Instead, plaintiffs must challenge a discrete agency action that is harmful to them for their claim to be ripe. *Id*. Ripeness is a question of law that we review de novo. *See Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010). In a similar context, we held that plaintiffs must challenge "specific, final agency action[s]" rather than "forest-wide management practices" to satisfy the requirements of *Lujan*. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (challenges

---

[4] The PACFISH guidelines, adopted by the Forest Service in 1994, apply to anadromous fish-producing watersheds, while INFISH applies to the native inland fish-producing watersheds at issue here.

to monitoring and management practices pursuant to the NFMA "are reviewable when, and to the extent that, they affect the lawfulness of a particular final agency action").

Here, ONDA challenges 117 specific grazing authorizations pertaining to seven of the 104 grazing allotments in the MNF. The units at issue within those allotments comprise 115,985 acres of the MNF's total 1.5 million acres. The parties do not dispute that the grazing authorizations at issue are final agency actions subject to review pursuant to the APA. *See ONDA I*, 465 F.3d at 983, 985, 990.[5] Moreover, ONDA's challenge to the Forest Service's NFMA consistency analysis is closely tied to site-specific grazing authorizations. *See Neighbors of Cuddy Mountain*, 303 F.3d at 1067 ("[T]here must be a relationship between the lawfulness of the site-specific action and the practice challenged."). Although ONDA pushes the boundary of ripeness by challenging a large number of grazing authorizations, the specifics of ONDA's challenge persuade us that this lawsuit is sufficiently ripe.[6]

---

[5] Because it does not affect our ultimate disposition of this case, we assume, without deciding, that grazing permits and grazing permit modifications are reviewable final agency actions pursuant to the APA, just as AOIs are.

[6] The Forest Service's reliance on *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004) to support its argument that ONDA's suit is barred by *Lujan* is misplaced. *SUWA* describes the requirements for review of agency *inaction* pursuant to 5 U.S.C. § 706(1). *See* 542 U.S. at 61–62. Here, it is undisputed that ONDA has challenged site-specific, discrete grazing authorizations, so *SUWA* is inapposite.

## II. Mootness

The Forest Service also argues that, because many of the challenged grazing authorizations have since expired, this challenge is moot. We review mootness, a question of law, de novo. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002). "The burden of demonstrating mootness is a heavy one." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001). We note that "completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given." *Neighbors of Cuddy Mountain*, 303 F.3d at 1065.

The carryover effects of the allegedly unlawful grazing authorizations challenged in ONDA's complaint extend beyond the year of grazing and can be remedied by this court. The relief requested by ONDA could remedy the past allegedly arbitrary and capricious authorizations by halting grazing and allowing the seven allotments' riparian habitats to recover from the alleged cumulative damage of years of grazing activity.[7] *See Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1094 (9th Cir. 2003) (challenge to grazing program was not moot, even where it had expired, because "the district court could order the [Forest] Service to develop tactics to mitigate the damage caused by the violation, such as moving or removing livestock from the allotments so the land can repair itself."); *Neighbors of Cuddy Mountain*,

---

[7] ONDA's fifth amended complaint asks for injunctive relief only with respect to claims that are not on appeal. However, because the complaint also requests "any such further relief as requested by the Plaintiffs or as this Court deems just and proper," we can consider further injunctive relief in deciding whether this appeal is moot. *See Neighbors of Cuddy Mountain*, 303 F.3d at 1066 (citing *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1014–15 (9th Cir. 1989).

303 F.3d at 1065–66  (review of timber sale after trees had been cut was not moot, because court could still order Forest Service to mitigate the damage caused by the sale).  ONDA's challenge concerns the cumulative effects of grazing on bull trout habitats and is a sufficiently live controversy which the court could address, for example, by ordering the Forest Service to suspend and/or minimize grazing on the allotments in question.  Accordingly, we rule that this dispute is not moot.[8]

## STANDARD OF REVIEW

Having decided that this dispute is justiciable, we now consider the merits of ONDA's appeal.  We review the district court's decision on cross-motions for summary judgment de novo.  *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011).  We review alleged violations of the NFMA pursuant to 5 U.S.C. § 706(2)(A), which prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018).  "Review under the arbitrary and capricious standard 'is narrow, and [we do] not substitute [our] judgment for that of the agency.'" *Lands Council*, 537 F.3d at 987 (alterations in original) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006), *abrogated in part on other grounds by Winter*, 555 U.S. 7).  We will strike down an agency action as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to

---

[8] It appears that the Forest Service abandoned its argument that grazing authorizations from 2013–15 were moot in the district court.  In any case, our mootness ruling embraces all the grazing authorizations at issue.

consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [if the agency's decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *All. for the Wild Rockies*, 907 F.3d at 1112.

## ANALYSIS

## I. Procedural Challenge

ONDA argues that the Forest Service's grazing authorizations were an arbitrary and capricious application of the APA and the NFMA because, before issuing them, the agency failed to adequately "analyze and show" their consistency with Standards GM-1 or 5. In its briefing, ONDA appeals to the "*NFMA's distinct requirement* that *the Forest Service* analyze and show that each grazing decision it makes is consistent" with the Forest Plan in a contemporaneous written document. ONDA's Brief at 48. But ONDA cites no statute or regulation containing any such requirement, let alone describing the analysis's required form, timing, or content. Moreover, the text of 16 U.S.C. § 1604(i), in pertinent part, requires only that "permits . . . shall be consistent with [forest] plans."

Instead, ONDA argues that our precedents have created a duty to "analyze and demonstrate consistency when it authorizes the use of public lands." ONDA's Reply Br. at 12. But the cases cited by ONDA all concern substantive violations of the NFMA contained within written analyses required by the National Environmental Policy Act (NEPA),

42 U.S.C. § 4321 *et seq.*, review process.[9] They do not stand for the proposition that the NFMA and the APA, on their own, require the Forest Service to "analyze and show," in a contemporaneous written document, that each of its actions conform to the applicable forest plan.[10]

Most recently, in *Alliance for the Wild Rockies*, we held that a Forest Service project, analyzed as part of a NEPA-mandated Final Environmental Impact Statement (EIS), substantively violated the applicable forest plan, effectively amending the forest plan within the project area, and thus violated the NFMA's consistency requirement. 907 F.3d at 1112–17. Similarly, in *Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010), we ruled that the Forest Service's NEPA-mandated Environmental Assessment for a proposed grazing AMP substantively violated the NFMA, its associated regulations, and the applicable forest plan, because it chose to analyze the project's effects on species diversity by using a proxy that was non-existent in the project area. *Id.* at 932–36. In *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002), we reviewed NEPA-mandated documents produced in connection with several timber sales and found substantive violations of the NFMA. *Id.* at 966–73. Finally, in *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002), we held that a NFMA challenge to a timber sale, based on the NEPA-mandated EIS's alleged failure to collect sufficient data on species populations (as

---

[9] ONDA notes, but does not dispute, the Forest Service's decision not to undertake a NEPA review for any of the challenged grazing authorizations at issue here.

[10] We note that the only two examples used by ONDA to illustrate its requested consistency analysis were also generated as part of documents required by the NEPA review process.

required by various regulations), was ripe, not moot, and not redundant of the plaintiffs' NEPA claim. *Id.* at 1065–71.

In the above cases, we analyzed NEPA-mandated documentation and emphasized the Forest Service's substantive obligation pursuant to the NFMA to ensure each project's consistency with the applicable forest plan. *See, e.g.*, *All. for the Wild Rockies*, 907 F.3d at 1113–15; *Native Ecosystems Council*, 599 F.3d at 934; *Neighbors of Cuddy Mountain*, 303 F.3d at 1062. We did not rule upon whether, in the absence of NEPA's requirements, the NFMA and the APA require a project's consistency analysis to be memorialized at the time the project is authorized.[11] And it is clear that the agency is capable of mandating such a procedure, if desired: as of 2012, the NFMA regulations require exactly this kind of written analysis. *See* 36 C.F.R. § 219.15(d) (2012) ("A project or activity approval document must describe how the project or activity is consistent with applicable plan components.").[12]

In other cases interpreting the NFMA we have held that "we [may not] impose 'procedural requirements [not] explicitly enumerated in the pertinent statutes.'" *Lands Council*, 537 F.3d at 993 (quoting *Wilderness Soc'y v.*

_____

[11] *Pacific Coast Federation of Fishermen's Ass'ns v. National Marine Fisheries Service*, 265 F.3d 1028 (9th Cir. 2001), also cited by ONDA, likewise involves procedural requirements originating from a statutory regime other than the NFMA: in that case, the ESA. *See id.* at 1034–35 (noting that the National Marine Fisheries Service, when it undertakes a project analysis required by the ESA, is permitted to inquire into forest plan consistency).

[12] This regulation does not apply to the Forest Plan at issue here, which was adopted in 1990. 36 C.F.R. § 219.17(c); *see All. for the Wild Rockies*, 907 F.3d at 1109 n.1.

*Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990)). We are mindful of the Supreme Court's mandate that "[a]bsent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."'" *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)). Because the Forest Service was not obligated by statute, regulation, or caselaw to memorialize each site-specific grazing authorization's consistency with the forest plan, the absence of such a document is not in itself arbitrary and capricious.

## II. Substantive Challenge

Although the gravamen of ONDA's appeal appears to be the claim, rejected above, that the Forest Service had a procedural duty to "analyze and show" consistency with the Forest Plan, we construe ONDA's appeal as implicitly challenging the substantive consistency of the challenged grazing authorizations as well. In our substantive review, we consider the administrative record and decide whether, in issuing the grazing authorizations, the Forest Service "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 993 (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

We recognize the Forest Service's substantive obligations to ensure that "[s]ite-specific projects and activities . . . be consistent with an approved forest plan,"

*All. for the Wild Rockies*, 907 F.3d at 1109 (citing 16 U.S.C.
§ 1604(i); 36 C.F.R. § 219.10(e)(1998)), and to "strictly
comply with a forest plan's 'standards,' which are
considered binding limitations," *id.* at 1110. *See also*
*Neighbors of Cuddy Mountain*, 303 F.3d at 1062. However,
our circuit's caselaw establishes that we give the Forest
Service ample latitude in ensuring the consistency of its
actions with Forest Plans: "We will conclude that the Forest
Service acts arbitrarily and capriciously only when the
record plainly demonstrates that the Forest Service made a
clear error in judgment in concluding that a project meets the
requirements of the NFMA and relevant Forest Plan." *Lands
Council*, 537 F.3d at 994. Moreover, we have held that "the
Forest Service's interpretation and implementation of its
own Forest Plan is entitled to substantial deference." *Native
Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th
Cir. 2012).

Thus, in reviewing the grazing authorizations'
consistency with the Forest Plan, we ask whether, "[b]ased
on the record before us, the [Forest] Service's actions . . .
reflect 'a clear error of judgment.'" *Forest Guardians*,
329 F.3d at 1098 (quoting *Morongo Band of Mission Indians
v. FAA*, 161 F.3d 569, 573 (9th Cir. 1998)). Moreover, while
we "cannot defer to a void," *Or. Nat. Desert Ass'n v. Bureau
of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010), "[e]ven
when an agency explains its decision with 'less than ideal
clarity,' a reviewing court will not upset the decision on that
account 'if the agency's path may reasonably be discerned.'"
*Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461,
497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas–Best
Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

### A.  Consistency with Standard GM-1

As described above, Standard GM-1 requires the agency to "[m]odify [its] grazing practices (e.g. accessibility of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.)" to the extent that those grazing practices "retard or prevent attainment of [RMOs] or are likely to adversely affect inland native fish."  Moreover, it requires the agency to "[s]uspend grazing if adjusting practices is not effective in meeting [RMOs]."

The record demonstrates that, during the period in question, the Forest Service did just that.  It monitored riparian habitat conditions at local and watershed scales and considered the modification and suspension of grazing before, after, and during each year's grazing season.  Among other activities, it conducted annual monitoring in each allotment of several endpoint indicators (including stubble height, shrub browse, bank alteration, and upland utilization) designed to move stream characteristics toward RMOs; prepared Biological Assessments pursuant to the ESA at the allotment-level which explicitly analyzed conformity with RMOs and INFISH standards; analyzed RMO compliance through the PACFISH/INFISH Biological Opinion Effectiveness Monitoring Program (PIBO) throughout the entire period in question; and consulted informally in 2007 and formally in 2012 with the U.S. Fish and Wildlife Service (FWS), each time receiving FWS approval of the Forest Service's determination that its proposed livestock management was "not likely to adversely affect" bull trout or bull trout critical habitat.[13]

---

[13] ONDA argues that the Forest Service's analyses are post-hoc and prepared for litigation purposes.  Given that this lawsuit began in 2003,

Given the cyclical nature of grazing, which, unlike a timber sale, is conducted on an annual basis with damage slowly accumulating over time, the Forest Service employs a multi-pronged approach to ensure consistency with its Forest Plan.  This is especially reasonable given the ongoing nature of the obligation in Standard GM-1, which could require the Forest Service to take action before, during, or even after the pendency of a given grazing authorization.  In *Forest Guardians*, we endorsed the Forest Service's grazing program for similar reasons, holding that phasing in grazing reductions was a "reasonable response" and emphasizing that monitoring grazing, in spite of past failures, was "a rational decision."  329 F.3d at 1098–99.

Moreover, the grazing authorizations themselves contain specific measures protecting riparian habitats and make those measures subject to ongoing inspections and negotiations with Forest Service officers.  Some of the grazing permits specifically refer to INFISH in their discussions of the permit's temporal, spatial, and use-related limits on grazing, and the grazing authorizations' limits protect RMO-related habitat features like stubble height, shrub browse, and bank stability.  The record contains transcripts of meetings between allottees and Forest Service officials in which the protection of bull trout habitat is specifically discussed.  And the Forest Service has on many occasions suspended or stopped grazing activity in response to potential effects on bull trout, indicating that it is not only

---

all of the grazing permits in question in this case were issued after the commencement of litigation.  Nevertheless, we note that the Forest Service's analysis upon which this ruling is based includes materials throughout the period at issue—from 2006 through 2015.

monitoring, but also enforcing plan standards related to the protection of bull trout habitats.

Finally, we note that the Decision incorporating Standard GM-1 into the Forest Plan stresses its flexibility. The Decision notes that "RMOs should be refined to better reflect conditions that are attainable in a specific watershed or stream reach," and "[i]t is not expected that the [RMOs] would be met instantaneously, but rather would be achieved over time," *See Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013) ("INFISH does not require RMOs to be achieved as soon as they are announced; instead, they serve as benchmarks against which progress can be measured and degradation prevented."). The Decision also notes that conforming to Standard GM-1 "will require professional judgement and should be based on a watershed analysis of local conditions." Finally, the Decision contemplates partial compliance, stating that if one RMO is "met or exceeded, there may be some latitude in assessing the importance of the objectives for the other features that contribute to good habitat conditions."

The continuing struggles of the bull trout in the MNF are undoubtedly troubling. But the lesson of *Lands Council* is that is that we are not a "panel of scientists" and cannot review agency actions as such. 537 F.3d at 988. As an illustration of the wisdom of this approach, the record in this case demonstrates that many factors beyond livestock grazing could be fueling the bull trout's decline. Other recognized factors include "the creation and management of [nearby] dams. . . irrigation withdrawals . . . past bull trout harvest, and introduction of non-native species (brook trout)." We defer to the Forest Service's expertise in determining whether, given the many factors at play, and given its extensive monitoring and enforcement activities

protecting bull trout habitats, it must modify or suspend grazing activity in order to comply with Standard GM-1. We hold that the Forest Service did not act arbitrarily or capriciously with respect to the NFMA's consistency requirement as applied to Standard GM-1 in issuing any of the challenged grazing authorizations.

## B.  Consistency with Standard 5

For similar reasons, ONDA's substantive argument that the MNF's grazing authorizations are arbitrary and capricious because they violate Standard 5 also fails. Standard 5 requires that the Forest Service "[p]rovide the necessary habitat to maintain or increase populations of management indicator species: bull trout, cutthroat trout, and rainbow/redband trout."  As discussed above, the record amply demonstrates that the Forest Service is actively engaged in protecting bull trout habitats from the effects of livestock grazing by monitoring the effects of grazing on various habitat indicators and implementing site-specific grazing limitations.

We also note that Standard 5 is a broad planning standard, one of fifty other standards that apply to this area, and thus it is challenging to enforce.  Caselaw counsels against enforcing open-ended standards in fact-specific contexts.  *Cf. SUWA*, 542 U.S. at 71 ("[A]llowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities."); *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1222 (9th Cir. 2011) ("[A]lthough the [Federal Land and Policy Management Act] mandates that the BLM preserve wilderness and manage public lands in accordance with land use plans, its mandates are not tantamount to a 'specific statutory command requiring' agency action." (quoting *SUWA*, 542 U.S. at 71)).

In any case, we certainly cannot effectively mandate, as ONDA would have us do, that bull trout numbers increase, given the indirect language of Standard 5 and the causal complexity underlying the bull trout's population decline. The Forest Service's ongoing site-specific monitoring, analysis, and enforcement activities aimed at protecting and improving bull trout habitats, described above, were reasonable means of ensuring consistency with Standard 5. *See Forest Guardians*, 329 F.3d at 1098–99. We hold that the Forest Service did not act arbitrarily or capriciously with respect to Standard 5 in issuing any of the challenged grazing authorizations.

## CONCLUSION

The administrative record demonstrates that the Forest Service did not act arbitrarily or capriciously, on either a procedural or substantive basis, in issuing the challenged grazing authorizations. Heeding the clear lesson of *Lands Council*, we defer to the agency's reasonable exercise of its scientific expertise in choosing how best to meet the requirements of its Forest Plan while accommodating the competing interests of environmental, recreational, extractive, and other uses in the Malheur National Forest. Accordingly, we **AFFIRM** the district court's grant of summary judgment for the Forest Service and Intervenors.

**AFFIRMED.**